## Case No. 777.

### BAKER et al. v. PORTLAND.

[5 Sawy. 566;[1] 20 Alb. Law J. 206; 8 Reporter, 392; 4 Cin. Law Bul. 620; 11 Chi. Leg. News, 375; 25 Int. Rev. Rec. 321; 3 Pac. Coast Law J. 469.]

Circuit Court, D. Oregon. July 21, 1879.

CHINESE — RESIDENCE — TREATY — POWERS OF A STATE — LEGISLATIVE ACT IN CONFLICT WITH TREATY — MULTIFARIOUSNESS — CONTRACTORS— REMEDY AT LAW.

1. The right to reside in a foreign country implies the right to labor there for a living.
[Cited in Re Parrott, 1 Fed. 507.]
[See In re Ah Chong, 2 Fed. 733, and In re Quong Woo, 13 Fed. 229.]

2. A state has no power to interfere with or in any way limit the operation of a treaty of the United States.
[Cited in Re Parrott, 1 Fed. 517.]
[See Gibbons v. Ogden, 9 Wheat. (22 U. S.) 211; Henderson v. Mayor of New York, 92 U. S. 272.]

3. If it be admitted that a state has the general power to say who it will employ, or who its contractors shall employ, still the state being a member of the Union, and subordinate in the exercise of its general powers to the constitution of the United States and the laws and treaties made in pursuance thereof, it cannot exercise this power in any case where it conflicts with the operation of such constitution, laws or treaties.

4. A legislative act of the state of Oregon, which prohibits the employment by contractors of Chinese upon street improvements or public works, but permits all other aliens to be so employed, is in conflict with the treaty between the United States and the emperor of China, which secures to the Chinese, resident here, the same right to be employed and labor for a living as the subjects of any other nation, and is therefore void.

5. Parties having distinct claims against the same defendant cannot maintain a suit in equity thereon, jointly; and a bill containing two or more such claims is multifarious.

6. Any number of persons who may from time to time be engaged in making street improvements under several and distinct contracts with the city are not therefore a class of persons having a common interest in the subject of street improvements concerning which any one or more may sue for the whole.

7. A party threatened with proceedings under a void act has an adequate remedy at law.

[In equity. Suit by Perry Baker and others to enjoin the city of Portland from enforcing a state law prohibiting the employment of Chinese laborers for certain purposes. Defendant demurs. Demurrer sustained.]

James G. Chapman, for complainants.
F. O. McCown and Julius C. Moreland, for defendant.

DEADY, District Judge. This suit is brought to injoin the city of Portland from enforcing an act of the legislature, approved October 16, 1872, (Sess. Laws, p. 9,) entitled "An act to prohibit the employment

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission. 8 Reporter contains partial report only.]

of Chinese laborers on the improvement of streets and public works in this state." It provides, that "It shall be unlawful to employ any Chinese laborers on any street, or part of street, of any city or incorporated town of this state, or on any public works or public improvement of any character, except as a punishment for crime, and all contracts which any person or corporation may have for the improvement of any such street, or part of street, or public works or improvements of any character, shall be null and void from and after the date of any employment of any Chinese laborers thereon by the contractor."

The bill alleges that the complainants "are residents, citizens, property holders and taxpayers" of Portland, and now are and have been for many years engaged in the business of contracting for and making street improvements therein; that the defendant by its mayor and common council now require the complainants and other contractors to give bonds not to employ any Chinese labor upon such improvements, and threatens to refuse payment to any contractor and declare him delinquent who shall do so; that the said act of the legislature and the acts of the defendant thereunder are contrary to the constitution and laws of the United States and its treaty with the Ta-Tsing empire and contrary to the rights of "the complainants and other property holders, residents, citizens and taxpayers" of Portland and "the contractors and bidders upon the street improvements and other public works of the defendant; that the work upon the streets of the defendant is required by law to be let to the lowest responsible bidder, and that the defendant has contracted for and is about to contract for upwards of fifty thousand dollars worth of work upon its streets to be done this season, and has required, and declares that it will in all cases require contractors and bidders to give bond not to employ Chinese labor upon such work; that "said acts of the defendant done and threatened are and will be an irreparable injury to the complainants and other contractors and bidders" upon the street improvements of Portland and "to other residents, citizens, property holders and taxpayers" of the same, of many thousands of dollars; that "the injury to the complainants in the completion of their several contracts with defendant, already entered into for street improvements," by reason of being compelled to give bond as aforesaid, and "the threats and declarations of defendant to prohibit the employment of Chinese laborers upon its street improvements" by the means aforesaid "will amount to upwards of one thousand dollars."

Upon reading and filing the bill—July 7—an order was made that the defendant show cause why a provisional injunction should not issue as prayed for. The defendant showed cause by demurring to the bill which on July 14 was argued by counsel.

The demurrer sets up: 1. That this court has no jurisdiction to grant the relief prayed for; 2. That the bill is without equity; 3. That the complainants have no privity of interest, and are therefore improperly joined as parties; and, 4. That complainants have "a full and complete remedy at law."

As to the want of jurisdiction, it is claimed that it does not appear that the matter in dispute exceeds the sum of five hundred dollars, but on the hearing it was tacitly admitted that otherwise this was a case of federal cognizance, because arising under a treaty made by authority of the United States—namely, the treaty of June 18, 1858, [12 Stat. 1023,] and the additional articles thereto of July 28, 1868, [16 Stat. 739,] between the United States and the emperor of China.

Article 5 of said additional articles declares that the two high contracting parties "cordially recognize the inherent and inalienable right of man to change his home and allegiance, and also the mutual advantage of the free migration and emigration of their citizens and subjects respectively from the one country to the other, for the purpose of curiosity, of trade, or as permanent residents," while article 6 of the same declares that "Chinese subjects visiting or residing in the United States shall enjoy the same privileges, immunities and exemptions in respect to travel or residence as may be then enjoyed by the citizens or subjects of the most favored nation," and that citizens of the United States visiting or residing in China shall enjoy there the same privileges, etc. Public Treaties U. S. 148.

This treaty, until it is abrogated or modified by the political department of the government, is the supreme law of the land, and the courts are bound to enforce it fully and fairly. An honorable man keeps his word under all circumstances, and an honorable nation abides by its treaty obligations, even to its own disadvantage.

The state cannot legislate so as to interfere with the operation of this treaty or limit or deny the privileges or immunities guaranteed by it to the Chinese residents in this country. As was said by Mr. Justice Field in the "queue ordinance case," lately decided in the circuit court for the district of California, [Ho Ah Kow v. Nunan, Case No. 6,546,] to the national government "belong exclusively the treaty-making power and the power to regulate commerce with foreign nations, which includes intercourse as well as traffic. * * * That government alone can determine what aliens shall be permitted to land within the United States and upon what conditions they shall be permitted to remain."

It will be observed that the treaty recognizes the right of the Chinese to change their home and allegiance and to visit this country and become permanent residents thereof, and as such residents it guarantees to them

all the privileges and immunities that may be enjoyed here by the citizens or subjects of any nation. Therefore, if the state can restrain and limit the Chinese in their labor and pursuits within its limits, it may do the same by the subjects of Great Britain, France, or Germany.

True, this act does not undertake to exclude the Chinese from all kinds and fields of employment. But if the state, notwithstanding the treaty, may prevent the Chinese or the subjects of Great Britain from working upon street improvements and public works, it is not apparent why it may not prevent them from engaging in any kind of employment or working at any kind of labor.

Nor can it be said with any show of reason or fairness that the treaty does not contemplate that the Chinese shall have the right to labor while in the United States. It impliedly recognizes their right to make this country their home, and expressly permits them to become permanent residents here; and this necessarily implies the right to live and to labor for a living. It is difficult to conceive a grosser case of keeping the word of promise to the ear and breaking it to the hope than to invite Chinese to become permanent residents of this country upon a direct pledge that they shall enjoy all the privileges here of the most favored nation, and then to deliberately prevent them from earning a living, and thus make the proffered right of residence a mere mockery and deceit. In Chapman v. Toy Long, [Case No. 2,610,] this court, in considering these provisions of this treaty, said: "The right to reside in the country, with the same privileges as the subjects of Great Britain or France, implies the right to follow any lawful calling or pursuit which is open to the subjects of these powers."

Whether it is best that the Chinese or other peoples should be allowed to come to this country without limit and engage in its industrial pursuits without restraint is a serious question, but one which belongs solely to the national government. Upon it there has always been a difference of opinion, and probably will be for years to come.

But so far as this court and the case before it is concerned, the treaty furnishes the law, and with that treaty no state or municipal corporation thereof can interfere. Admit the wedge of state interference ever so little, and there is nothing to prevent its being driven home and destroying the treaty and overriding the treaty-making power altogether. But it is not necessary to consider further this feature of the case, because this demurrer must be sustained upon other grounds.

These complainants cannot jointly maintain this suit. There is no privity of interest between them. They are neither partners nor co-contractors. If either has a cause of suit it is on account of his separate contract with the city concerning the improvement of distinct streets or parts thereof. They have no common interest in the subject or object of the suit, but assert distinct and several claims against the defendant growing out of distinct and several contracts and matters relating thereto. The complainants are misjoined and the bill is so far multifarious. Yeaton v. Lenox, 8 Pet. [33 U. S.] 126; West v. Randall, [Case No. 17,424;] Story, Eq. Pl. §§ 279, 283, 544.

On the argument of the demurrer it was sought to be maintained that the complainants and other persons not named therein, who, like the complainants, are engaged in taking and performing contracts for the improvement of streets, constitute a class, called contractors, who therefore have a common interest in the subject of this suit, and that such being the case a bill may be maintained by one or more for the benefit of the whole, as in the case of a creditor's bill or a bill by the part of a crew of a privateer against prize agents for an account.

But there is no analogy between these cases and the one under consideration. All persons engaged in making street improvements, may have an interest in the questions involved in this litigation, but they have no interest in the object of this or any suit to enjoin the defendant from enforcing the act against Chinese labor, unless they are actual and proper parties to it. Persons engaged in making street improvements under several and distinct contracts with the city, are not, therefore, a class of persons having a common interest in the subject of street improvements, concerning which any one or more may sue for the whole. Story, Eq. Pl. § 97 et seq.; Adams, Eq. § 319.

Neither does it appear that the matter in dispute here exceeds in value the sum of five hundred dollars. The matter in dispute is the alleged right of the complainants to perform the two several contracts which they have taken for the improvement of the streets without being prohibited from employing Chinese labor. The injury which they may sustain by reason of the act being enforced against them is the only practical test of the value of the matter in dispute. The bill alleges that this will be more than one thousand dollars; but the allegation is vague and uncertain, and the estimate appears to include not only the loss which may arise upon the contracts which the complainants now have, but others which they may hereafter undertake.

Again, it is easy to see how the Chinese who are excluded from a certain field of labor by this act, and the property holders who, notwithstanding the pretense in the emergency clause, that it was made for their benefit, are thereby compelled to pay the increased cost of improving the streets adjoining their property are injured by the operation of it, but the case of the contractor is different. If, as is assumed, the exclusion of Chinese labor increases the cost of the

work, then presumably the contractor gets more for doing it. No one is bound to take a contract to improve the streets; and it being understood when the contract is let that Chinese labor shall not be employed, the reasonable inference is that parties make their bids accordingly.

The demurrer is sustained, and the restraining order vacated.

On a rehearing of this case before Mr. Justice FIELD, and DEADY, District Judge, on August 21, 1879, the decree sustaining the demurrer was affirmed, and the bill dismissed. In delivering the oral opinion of the court, Mr. Justice FIELD, in substance, said:

I agree with the ruling of the district judge in sustaining the demurrer to this bill; and for the additional reason that the plaintiffs have an adequate remedy at law. Assuming that the act in question is invalid, because in conflict with our treaty with the emperor of China, then the plaintiffs, as bidders or contractors, may disregard it, and if the city refuses to give them contracts to which they are otherwise entitled, or to pay them for contracts performed with the aid of Chinese labor, they may sue the city at law, either to compel the municipal authorities to give them the contracts to which they are entitled, or to pay them for those they have performed.

NOTE, [from original report.] It is said that the state has the same right as an individual to say who it will employ. This proposition assumes that the state is the employer of persons who work upon street improvements. But this is denied upon the ground that the owner of the property being compelled to pay for the improvement is the real employer, and that the state only interferes to compel the owner to make the improvement, and to secure uniformity in the character and time of doing the same. But admitting, for the present, that the state has such a general right, and further that it is the employer of persons who work upon street improvements under contractors, yet the state, being a member of the Union, and subordinate to the constitution, laws and treaties of the United States, in the exercise of its powers, it may be restricted in the exercise of this right in particular instances, by the operation of such constitution, laws or treaties. For instance, the state has the general power of taxation, but as a member of the Union it is restrained in the exercise of this power by the operation of the constitution and laws of the United States, so that it is in effect prohibited from taxing articles of great value, the property of its citizens, because the same are also the agencies or means by which the national government exercises its comparatively supreme powers. The bonds and notes of the United States, issued by it in pursuance of its power to borrow money, are instances in point.

Therefore, if the state cannot exercise this general right to say who it will employ in this class of cases without coming in conflict with the operation of the treaty, then it is virtually prohibited from so doing. This treaty having guaranteed to the Chinese the right to reside here permanently with the same privileges and immunities as the subjects of Great Britain, Germany and France, which certainly includes the right to labor for a living, if it includes anything, the state cannot, in the exercise of any of its admitted general powers, limit or deny this right.

If this act had provided that no alien should be employed on street improvements or public works it might be said that it did not discriminate against Chinese and was therefore not obnoxious to the charge of infringing the treaty. But as it is, the act in effect denies the Chinese the privilege of laboring for a living in a field where it permits all other aliens to be employed without restriction, and thus so far denies to them the privileges and immunities enjoyed by the subjects of other nations, which is directly contrary to the treaty.

The only legal remedy for the evils, real or fancied, of Chinese or other immigration, is by an appeal to the national government, in whom the power over the subject is exclusively vested. But the fact is, the anti-Chinese legislation of the Pacific coast is but a poorly disguised attempt on the part of the state to evade and set aside the treaty with China, and thereby nullify an act of the national government. Between this and "the firing on Fort Sumter," by South Carolina, there is the difference of the direct and indirect—and nothing more.          M. P. D.